PROVOSTY, J.
The commission council of the city of New Orleans adopted the following ordinance:
“No. 3283 Commission Council Series.
“Whereas Mrs. Eve Christine Butterworth, widow of John Dibert, in order to perpetuate the memory of her departed husband, and, at the same time, bestow a great benefaction upon an unfortunate class of our citizens, suffering from a dread disease, which it is her aim as well as that of the city of New Orleans to adopt all measures for its treatment and eradication, has proposed to co-operate with the city of New Orleans in the establishment, maintenance and operation by the said municipality of a tuberculosis hospital in the city of New Orleans, to be known and designated as the ‘John Dibert Tuberculosis Hospital of the City of New Orleans,’ and, to that end, and upon the condition that the city of New Orleans will furnish the site therefor and will obligate itself by ordinance to annually and perpetually appropriate the sum of ton thousand ($10,000) dollars, out of its annual alimony budget, in partial aid of the conduct, operation and maintenance of said hospital, and will create a board of trustees who shall have perpetual succession and be invested with plenary powers to maintain, operate, manage and direct said hospital, she, the said Mrs. Eve Christine Butterworth, will donate to the board of trustees first appointed *277 hereunder the sum of fifty thousand ($50,000) dollars in cash to be used and employed in the erection and equipping of a suitable building or buildings for the purpose of such hospital on the site hereinafter dedicated to that purpose by the city of New Orleans, under such plans and specifications as the said board of trustees may adopt and she, the said Mrs. Eve Christine Butterworth, will likewise create a trust or endowment fund in the sum of one hundred and fifty thousand ($150,000) dollars, in cash, or its equivalent in securities, at her option, on the condition that only the revenue derived from the investment of such endowment or trust fund by the said board of trustees shall be used, and that its use shall be applied to assist in maintaining said hospital: Therefore:
“Section 1. Be it ordained by the commission council of the city of New Orleans, that a hospital, to be known as the John Dibert Tuberculosis Hospital of the City of Now Orleans, for the care and treatment of persons afflicted with tuberculosis, and who reside in the city of New Orleans, be and the same is hereby created and established, and that as the site thereof the following described property, belonging to the city of New Orleans, be and the same is hereby dedicated, to wit: A certain
square of ground, together with all the buildings and improvements thereon and all the appurtenances thereunto belonging, situate in the First district of this city, designated by the No. 777, bounded by Carrollton and Tulane avenues, Solomon and Ulloa streets, and measuring more or less two hundred and ninety-six feet, five inches and seven lines front on Carrollton avenue, three hundred and fifty-five feet one inch and five lines front on Solomon street, three hundred and fifty-five feet, seven inches front on Ulloa street, and three hundred and thirty-six feet, nine inches and four lines front on Tulane avenue, containing twenty-seven lots of ground.
“Sec. 2. Be it further ordained, etc., that a board of trustees to be known as ‘the Board of Trustees of the John Dibert Tuberculosis Hospital of the City of New Orleans,’ said boa.rd to be composed of seven (7) citizens of the city of New Orleans, male or female, and who shall hold office during good behavior, be and the same is hereby created. The following named persons shall compose the first board of trustees: Mrs. Eve C. Dibert, Harold W. Newman, P. H. Saunders, Marcus Walker, Martin Behrman, Ernest T. George, Chas. J. Theard.
“See. 3. Be it further ordained, etc., that all vacancies on said board, arising from any cause whatsoever, shall be filled by the said board of trustees.
“Sec. 4. Be it further ordained, etc., that the said board of trustees shall have full, complete and plenary powers to build or cause to be built and constructed a suitable building or buildings necessary for the purpose of said hospital and shall have ’sole and exclusive control, charge, operation and management of the said hospital, and of all its revenues, properties or things of value which it may at any time have or acquire by whatsoever title under such rules and regulations as the said board of trustees may choose to adopt.
“Sec. 5. Be it further ordained, etc., that the said board shall elect from its membership a president, vice president, and from its body or from without, a secretary-treasurer, which latter shall be required to give bond in such a sum as the said board of trustees may determine, for the faithful performance of his duties. And the said board shall have full power and authority to hire and discharge all other officers, servants, agents or employés as in its judgment may be deemed meet and proper, and to fix their salaries, wages or other recompense.
“Sec. 6. Be it further ordained, etc., that the members of the said board of trustees shall serve without any compensation or pay whatsoever. The said board of trustees shall make an annual report to the mayor and council of the city of New Orleans, during the month of January, in writing, of the fiscal and other affairs of the said institution.
“Sec. 7. Be it further ordained, etc., that in order to aid in the maintenance of the said hospital, the city of New Orleans does hereby bind and obligate itself to appropriate annually and in perpetuity, out of its annual alimony budget, the sum of ten thousand ($10,000) dollars, to be turned over and paid to the treasurer of the said board of trustees.
“Sec.-8. Be it further ordained, etc., that the munificent offer of Mrs. Eve Christine Butter-worth to pay into the treasury of the first board of trustees of said hospital the sum of fifty thousand ($50,000) dollars in cash for the purpose of building and equipping the edifices necessary to the conduct, operation and management of the hospital, and to endow said hospital in the sum of one hundred and fifty thousand ($150,000) dollars, in cash, or securities, at her option, the said endowment to remain intact and undisturbed save and except to the extent of its revenues and earnings, which revenues and earnings are to assist in the maintenance and operation of the said hospital, be and the same is hereby accepted.
“Sec. 9. Be it further ordained, etc., that tho present ordinance shall be embodied in, and shall form a contract between Mrs. Eve Chris *279 tine Butterworth and the city of New Orleans, and shall be evidenced by a notarial act passed and executed before the city notary, and signed by the said Mrs. Eve Christine Butterworth and by the mayor of the city of New Orleans, for the city of New Orleans, hereby authorized so to do, and shall take effect and go into operation from and after the said contract shall have been signed and executed.”
The notarial act referred, to in the last section of this ordinance was duly passed, and the city and Mrs. Dibert obligated themselves therein respectively to carry out the conditions expressed in the ordinance.
The city architect, after having traveled extensively through the North and East' for noting the latest developments in the way of hospitals, prepared plans for a fireproof building strictly modern in every respect, and these plans were approved by the city. To meet the estimated cost of the building, Mrs. Dibert added $103,000 to the original $50,000 donated for the building making a total of $153,000 for the building.
The present suit was then brought. The plaintiffs describe themselves as citizens and taxpayers of the city of New Orleans living “adjacent to or in the vicinity” of the proposed hospital site. They pray that the said ordinance and contract be decreed to be null and void and of no effect, as being ultra vires, and that the city be enjoined from carrying it out or acting under it. Their grounds of nullity are stated in the petition as follows:
“(1) That the proposed hospital is for a contagious, infectious, and communicable disease, and as such is a nuisance, particularly in a populous residential section of the said city.
“(2) That the city of New Orleans has no power or authority under its charter, nor under any law nor inherently, to create, operate, or maintain a hospital of any kind for the treatment of tuberculosis.
“(3) That the hospital referred to and contemplated by the said illegal ordinance and contract is not a public institution, but, on the contrary, is a private enterprise under the charge, supervision, and absolute control and management of a board of trustees which is not a part of the city government and is absolutely free from any control or direction or supervision by the said city or any department of the city government, and the city has no power or authority to create such a hospital nor to assist in nor contribute - to its establishment, maintenance, or operation.
“(4) That neither the city of New Orleans nor its commission council has any power or authority to create a board of trustees for the control, charge, operation, or management of the hospital contemplated by said illegal ordinance and contract, and more particularly is the said city and its commission council without power or authority to authorize the appointment of women on any board of trustees.
“(5) That the donation referred to and contemplated in said illegal ordinance and contract is not made to the city of New Orleans, but to private persons for private purposes, and the city of New Orleans has no power or authority to accept such a donation or to countenance the same.
“(6) That, even if the city of New Orleans has power or authority to create, maintain, manage, or operate a hospital, and particularly a hospital for persons suffering from tuberculosis, which is denied, the said city has no power or authority to delegate such powers, if they he possessed by the city, to other persons, as is attempted to be done under and by virtue of the illegal ordinance and contract hereinabove referred to.
“(7) That neither the city of New Orleans nor its commission council has any power or authority to make a perpetual appropriation of any sum of money for any purpose even if the said city or its commission council has authority to make any appropriation whatever for the hospital referred to and contemplated in the said illegal ordinance and contract, which is denied.
“(8) That the attempt of the said city of New Orleans by said illegal ordinance and contract to dedicate the square of ground hereinabove described for the site of the tuberculosis hospital referred to and contemplated in said illegal ordinance and contract, and the obligation to appropriate $10,000 per annum in perpetuity or to appropriate any other sum of money on one or more occasions for the benefit of said hospital, or to assist in its operation, maintenance, and management, violates the provisions of article 58 of the Constitution of this state, which provides, among other things ‘that the funds, credit, property or things of value of the state, or of any political corporation thereof, shall not be loaned, pledged or granted to or for *281 any person or persons, association or corporation, public or private; nor shall the state, or any political corporation, purchase or subscribe to the capital stock of any corporation or association whatever, or for any private enterprise. Nor shall the state, nor any political corporation thereof, assume the liabilities of any political, municipal, parochial, private or other corporation or association whatsoever. $ * * y a
[1] In so far as the present suit is based upon the alleged probability that the hospital in question will prove to be a nuisance, the plaintiffs, in their quality of citizens and taxpayers, have no right of action. Citizens and taxpayers have no standing as such for championing the rights of the public in abating a nuisance. 20 R. C. L. 460, § 77; 29 Cyc. 1208. A fortiori they have no standing for opposing acts which may after all prove to he inoffensive. On the ground of nuisance, the plaintiffs have a standing, therefore, in the present case, only in their individual capacity. As individuals, they are not complaining that their property will be depreciated in value. They do not so allege; nor do they allege what property they have. Their complaint is that the said hospital will endanger their health and that of their families.
[2-4] Two of them have moved away from the neighborhood, and may therefore be considered to be out of the case in so far as suing in their individual capacity. Another of them lives 600 feet from the square in question. lie also may be considered to be practically out of the case, so far as the question of nuisance is concerned; for to hold that a tuberculosis hospital cannot be located within, 600 feet of any residence would be practically to hold that it cannot be located at all in a city or town, and, we imagine, no one would so contend. The fourth plaintiff’s residence does not face the square in question, but is on the near corner of one of the adjoining squares. If it were proved with certainty that this hospital would endanger the health of this plaintiff or his family, perhaps a case might be presented for judicial interference. But the very opposite is conclusively shown by the evidence, which is all one way to the effect that a well-kept tuberculosis hospital is not a menace to the health of the people living in its vicinity ;■ and the presumption is that this hospital will be well kept.
The square in question, or proposed hospital site, is 346 by 326 feet, and is vacant. And so are two of the squares adjoining it, the one back, and the one to the right, if we assume it to face Carrollton avenue; and so is the territory further on in that direction, a distance of several squares except for some sawmills. Carrollton avenue is a wide street, with two roadways and a neutral ground. On the square on the other side of it, opposite the hospital site, the constructions on that side facing the avenue are two cottages, one gasoline station, and a vulcanizing plant. The square to the left, on the other side of Ulloa street, has on the side facing Ulloa street only two structures, one of which, we understand, is a sort of factory, and the other a residence. This residence faces Carrollton, but is near the corner of Ulloa. One of the cornering squares on the other side of Carrollton avenue is occupied by a baseball park; one of the cornering squares on the other side of Ulloa street is vacant. If on such a spot as this a hospital could not be located, where else could one be located, except entirely outside of city limits. And to locate it out of city limits would rob it of the greater part of its usefulness.
Our conclusion is that the suit is groundless in so far as it is sought to be founded on the apprehended injurious character of the proposed hospital.
The other grounds, those which the plaintiffs are urging in their quality of citizens *283 and taxpayers, involve the right of the city of New Orleans to enter into the contract in question with Mrs. Dibert. That is a question which depends largely upon the facts, and, as they are stated in the testimony about as briefly as we could state them, we deem it best to reproduce the testimony:
“Q. Mr. Newman, were you a member of the city government in the year 1916, when this ordinance under consideration was adopted? A. I was. Q. Will you state briefly to the court what led up to the adoption of this ordinance? A. Well, from the time that I started as commissioner of public safety, I naturally was in very close touch with the affairs of the city board of health, of which, under the city charter — the commission council charter — I was a member. The showing made by the city board of health in its weekly report showed me almost from the beginning, say, from December, 1912, that among the deaths from communicable diseases, which ran from, say, from 24 to 30'a week, that approximately 90 per cent, were tuberculosis. In addition to that startling information which I gathered from the report, and the conditions that I ascertained from the various applicants who appeared before the budget committee, of which I was also a member, who came before that committee for financial help in the handling of this tuberculosis situation in our city, I was very much impressed, indeed, with the requirements of a hospital for the treatment of that disease. I had made efforts, reference to which is unnecessary at this time, however, with parties to' make provisions for supplying the necessary funds, the city being without adequate funds to control this situation ; and, to make a long story short, I succeeded in interesting Mrs. John Dibert, who initially agreed to give $50,000 towards the founding of this hospital, and, after a good deal of discussion and several meetings, Mrs. Dibert, at the time this ordinance was introduced, agreed to give $50,000 towards the building of such a hospital, and $150,000 towards the endowment of the institution, provided the city would furnish the site which is referred to in the ordinance and dedicate $10,000 a year towards the maintenance of the hospital out of the alimony of the city. Mrs. Dibert also requested certain conditions which were incorporated into this ordinance, among which were the manner of control, and subsequently, as our work progressed, she added to this $200,000 a further sum of $103,000, making a total of $303,000, all of which has been paid over to this board of' trustees. The entire sum has been paid. Now, in reference to the location of the hospital, this site, which was made part of the ordinance, was a piece of property that was bought by the city of New Orleans originally for the contemplated boys’ high school, and it was abandoned for that purpose, on account of the situation, being on the outskirts of the built-up part of the city, and, being at the same time accessible to the physicians of New Orleans, who would render gratuitous services, it presented itself to us as being a very good situation. We took counsel, the city commission council did, with the leaders here in that character of work, and selected an advisory committee, consisting of the most eminent specialists in the treatment of tuberculosis, and formed an advisory committee, and their recommendation was— I found that the, greatest tuberculosis hospital in the world, the Phipps in Philadelphia, and the London Hospital for the treatment of cancer and consumption in that city, was situated in the very center of the population of these cities, and that the results were not harmful to the health of those centers. In addition to this, I had made investigations with reference to the placing of our own Isolation Hospital in the city of New Orleans, which is located in North, Rampart street, near St. Louis street, where bubonic plague and smallpox is treated, and, far from finding the location of these hospitals a disadvantage and menace to the public health, I found the health conditions were benefited, in my police work— I found it to be a benefit in those immediate localities. Q. I gather from your testimony, Mr. Newman, this hospital was very necessary to the city of New Orleans? A. Not only was it necessai-y, but it was a matter of reproach to ourselves that the tuberculosis situation in the city of New Orleans was one of very aggravated condition, and far from improving in our city, as it was in every other large city in this country where conditions were going on in the other direction, and it was a matter of real necessity that something should be done. Q. This square of ground, dedicated for this particular purpose, was owned by the city of New Orleans at that time? A. Tes, sir. Q. Are you an owner of real estate in this city, Mr. Newman? A. Tes, sir. Q. Do you consider the location of this hospital in this proposed section, or in some other section, would be a detriment or an advantage? A. I could go further than my opinion and say that, based on actual experience, I had found out that hospitals, as a rule, are unpopular ; but, in view of their absolute requirement and necessity of being placed, there is no escape from the fact they must be placed somewhere, *285 and that the records I have investigated have shown me in none of the locations in our own city have they worked any harm to the localities in which they were placed. I know from my own experience that the Touro Infirmary was placed in that locality long before the development of that section. That development came afterwards and that section is very thoroughly and thickly built up. I don’t know of ■^my special instance where the locality surrounding those institutions, for instance, the Hotel Dieu, the Charity Hospital, the Isolation Hospital, or the Presbyterian Hospital, have injured the conditions immediately surrounding those localities.”
Dr. George J. Dempsey testified as follows:
“Q. You are a practicing physician in the city of New Orleans? A. Yes, sir. Q. For how long? A. For about 18 years. Q. Have you had any experience in the treatment of tuberculosis? A. Yes, sir; quite extensively. Q. Is there at present in the city of New Orleans a hospital for the treatment of tuberculosis? A. Part of the hospital connected with the Charity Hospital. Q. Are you able to state whether or not there is any need of a hospital for the sole purpose for the treatment of tuberculosis? A. Yes, sir; absolutely so. Q. What do you base that statement on? A. In 1906 we formed the Tuberculosis League in the city of New Orleans, and— Q. What do you mean by ‘we’? A. A number of citizens, doctors, and ladies and young men. We established a clinic and institution for the preliminary stages of the disease, at Camp Hygen, which we are running-to-day, and we found the absolute necessity of having a place to put the cases in more than the preliminary stage of the disease. We found in the city of New Orleans we lost about 1,000 .people a year with tuberculosis alone. We also found that tuberculosis is curable in the first stages; a number of them curable in the second stages, and a small number of them curable in the third, or they can be arrested — the disease can be arrested. Therefore, in running the tuberculosis sanitarium, it was absolutely necessary to put the advanced cases in, and we have advocated that for the past ten years, personally, if it is of any benefit to the court, I will say I made an investigation in 1908 — 1907 and 1908 — I traveled extensively on the East and in Europe. I didn’t go specially for that purpose, but while I was traveling I took the situation into consideration. At that time in the East they were not as far advanced as they are to-day in the treatment of tuberculosis; they were really in the beginning of the fight at the time we were — although New York had their institutions, Philadelphia had their institutions, Washington and several other places had their institutions. New York had the clinics established, I think, about nine altogether, throughout the city of New York, which necessitated these advanced cases all visiting the clinic at least once in two weeks; and they found it necessary to have an establishment especially for these cases — these cases capable of infecting people. These establishments were located, some of them in the beginning, at a distance away from the city proper, which after-wards became sanitariums for the preliminary cases. Later they found it necessary to have the advanced cases closer to town. These advanced hospitals are not only used for the advanced cases of tuberculosis, but sometimes we have complications with tuberculosis, such as heart trouble, and we have to use it, although as clear and apparent a case may be advanced in tuberculosis, after relieving the other disease —that was the experience of the Eastern institutions — and we could send it out to that institution. In Europe and in London — London is one big city, which constitutes a whole lot of municipalities — there is one in one of the resident sections, and the institution that Mr. Newman spoke of, for cancer and consumption, that is in a prominent thoroughfare. The advantage in having an institution close to the city is that the families of the patients there can come and see them often, and we find, if you deprive these people of the privilege of seeing their own, it is a great hardship. We have that experience from our Charity Hospital here. Visiting is limited to certain hours, and it is hard to get to see them, not only for tuberculosis, but all diseases. Q. I gather from your statement, then, that a hospital of this sort is a necessity in the city of New Orleans. A. Absolutely. Q. Have you an idea of the number of tubercular cases, I mean cases of people afflicted in some stages of the disease? A. Some years ago we investigated that question, about two years ago or three years ago, while president of the league, and I established a chart, which is being used by some members of the league now, to designate the locality of these tuberculosis houses, where they were, and we arranged them in wards, and we got the report from the city board of health and the addresses of the patients, and on this map, which we had divided up into squares, each square we marked in lead pencil, right around the square how many cases were in that particular square. Well, that work went on until six or nine months ago, and unless some one follows it up it is usually neglected, and the amount of houses became so *287 great, we wore so astounded that we thought it best to stop. In other words, these houses were infected, and it was useless to attempt to do anything from the nursing standpoint or sanitarium standpoint, unless we had a place for confining these unfortunates. In other words, they would move from one house to another, and other people would move into the house and would become infected. We calculated that the 1,000 people dying a year from tuberculosis, and, as statistics showed it required about three years to kill them, there must have been at least from five to 9,000 cases in the city of New Orleans at all timos. Q. Now, was there any way to control these five to 9,000 cases you speak of? A. Under conditions, I will say, that exist now, without the establishment of a hospital for that purpose, absolutely not, without an institution of that kind. It would take more than one institution, too, to take care of the situation. Q. Will you state, if you know, Doctor, how New Orleans compares with other cities in its facilities for the treatment of tubercular patients? A. Well, financially, very poorly. Q. Are they behind or are they ahead of us in that line? A. Only in so far as the sanitarium is concerned and equipment; and we are limited on account of funds. Q. And by that you mean lack of hospitals? A. Yes, sir; the advanced cases — for treatment of the advanced cases. Q. Doctor, it is charged in the petition filed in this case that this proposed hospital is for contagious, infectious, and communicable diseases, and as such is a nuisance, particularly in the populous residential section of the city; what have you to say about that, particularly as regards to its being a nuisance or dangerous to the health of the people residing in that section of the city? A. A well-regulated hospital— First, I might say that tuberculosis is not a contagious disease; it is an infectious disease. What I mean by that is you have to come directly in contact with the patient or the sputum. In the second place, in a well-regulated hospital, there is not as much danger as there is in our average public school to-day. There is really more chance for an infection through the schools than there is through a well-regulated hospital. Q. As a matter of fact, is there not just as much, if not more, danger in tuberculosis being communicated to those not infected with it ,by visiting picture shows, theaters, or in the street cars or places where a crowd of people congregate? A. My testimony in regard to the public schools holds good as to public conveyances and public institutions. Q. I understand from your testimony that a man living 200 or 300 feet or 500 feet away from this hospital wouldn’t be in any danger whatever, so far as contracting this disease is concerned? A. In my opinion, he is safer than if he attended these public places where they do not attend to the usual hygienic measures.”
[5, 6] There can be no two opinions as to the imperative necessity for the city of New Orleans to make some provision for meeting the condition here described. This necessity, while not creating an enforceable legal duty, does create a municipal duty, and a clear one at that. The regular way of discharging this duty would be, of course, by means of the establishment and maintenance of a municipally owned and controlled hospital. But suppose the city is financially unable to do that; is this deplorable condition of things to be left to continue and daily grow worse? It would be strange, it seems to us, if any city, confronted by a situation of that kind and yet unable from lack of funds to cope with it by means of a municipally owned and controlled instrumentality, should be simply helpless, because destitute of power to adopt some other means ready to hand such as a contract like the one involved in this case.
No city in our country has, we dare say, broader powers than the city of New Orleans. The city is expressly authorized by section 6 of its charter (Act 159, p. 264, of 1912):
“To adopt such ordinances and regulations as shall be necessary or expedient for rhe protection of health and to prevent the spread of disease.”
And by section 1, par. “e”:
“The city shall also have all powers, privileges and functions which, by or pursuant to the Constitution of this State, have been, or could be, granted to or exercised by any city.”
In City of N. O. v. Shuler, 140 La. 657, 73 South. 715, this court said that the intention of this last paragraph was that—
“The legislative, executive, and judicial powers of the city shall extend to all matters of local and municipal government.”
*289 And in N. O. v. Le Blanc, 139 La. 113, 71 South. 248, this court said of this paragraph:
•‘It would be impossible to express more emphatically, than by the language thus used, the intention to confer upon the city all the power that it is competent for the General Assembly to confer upon any municipal corporation.”
Therefore, if it was competent for the Legislature to confer the authority in question, it has done so.
Act No. 136 of 1898, § 16, authorizes municipalities generally—
“to erect, establish and regulate hospitals, workhouses and houses of correction in the corporate limits or within three miles thereof, and provide for the government and support of same.”
The only question must therefore be whether anything contained in the Constitution would stand in the way of the Legislature authorizing the city to enter into such a contract as this one with Mrs. Dibert.
The objections are that this hospital is to be a private institution, and is to be under no contractual obligation to furnish its services free of charge, and that therefore the money appropriations and the dedication are grants of the city’s funds and property in violation of the above transcribed article 58 of the Constitution.
No doubt, the Constitution is to be private, since the city’s control over it will terminate with the appointment of the first board of trustees — in fact, has terminated. But it certainly is to be obliged to give its services free of charge to the poor and needy. While that stipulation is not contained in' express terms in the contract, it permeates it throughout; it is its very spirit or essence. Take it away, and the contract, instead of being what it professes and purports to be, a liberality, a “benefaction,” or charitable gift, on the part of Mrs. Dibert, becomes one in which she has derived an advantage over the city of New Orleans. Nothing was farther from Mrs. Dibert’s thought than to derive any advantage whatever from the contract, Her manifest idea is that her donation shall be a pure gift and charity. And the contract does not leave the city unprovided with the opportunity of knowing whether the contract'is being carried out according to that spirit; for by section 6 of the ordinance “a report of the fiscal and other affairs of said institution” is required to be made “during the month of January each year in writing” by the board of trustees to the mayor and council of the city. The ordinance and the contract carrying it out can be viewed in no other light than as a measure in the language of the charter “necessary and expedient for the protection of health and to prevent the spread of disease.”
There is no gift, except on the part of Mrs. Dibert. There is no grant of the funds • or property of the city within the meaning of article 58 of the Constitution. There is, in reality, nothing but á contract which the city makes in discharge of her municipal duty of protecting the public health. The fact that the appropriations are to be made in perpetuity, and that the dedication is perpetual, is immaterial, since the services to be rendered for protecting the public health, the rendering of which is the quid pro quo, the consideration, of the dedication and appropriations, is also to be perpetual, and since the .yearly rendering of an account by which the city may be enabled to know whether the contract is being faithfully carried out is also to be perpetual, and Since the failure of the board of trustees of the institution to carry out its part of the contract will, under the principles of the law of contract, have the effect of liberating the city from her obligations under the contract. Should in some distant future the hospital stop in its beneficent mission for want of unfortunates needing its ministration (which God grant may come to pass!), the appropriations too will have to cease, and the site ei-' *291 tlier revert to the city, or else be devoted with the constructions upon it to some cy pres purpose. '
[7, 8] On the question of nuisance vel non, the plaintiffs have an interest to litigate as individuals; on the question of whether the funds and property of the city are not being granted to a private institution, the plaintiffs have an interest to litigate in their capacities of citizens and taxpayers; on the other questions which they seek to raise, namely, as to the right of the city to create the board of trustees, or to put a woman upon it, or to accept the donation in question, the plaintiffs have no interest in litigating, and therefore have no standing for doing so, these matters being no concern of theirs.
Judgment affirmed.
MONROE, C. J., not having heard the argument, takes no part.