| | |
|---|---|
| 9 | 329 |
| 48 | 1095 |
| 49 | 1532 |

| | |
|---|---|
| 9 | 329 |
| 51 | 1218 |
| 51 | 1340 |

| | |
|---|---|
| 9 | 329 |
| f119 | 293 |

SUCCESSION OF J. LANZETTI—MAD. DE PONTALBA and M. BARNETT, JR., Appellants.

The title of the Act of 17th March, 1852, which is "an Act to provide a homestead for the widow and children of deceased persons," is not in violation of Article 115 of the Constitution, which declares that "every law enacted by the Legislature shall embrace but one object, and that shall be expressed in the title." Reasoning of the court in *Walker* v. *Caldwell*, 4 Ann. 298, affirmed.

The value of the right of occupying the leased premises belongs to the tenant—and when the right of a deceased tenant is sold—its price is subject to the privilege created by Act of 17th March, 1852.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J. *P. S. Biron*, for the succession.

*W. H. Hagan* and *H. B. Eggleston*, for *Barnett*:

The Act of 1852, is "to provide a homestead for the widow and children of deceased persons." Now, this Act does not give her or them a homestead, that is, the dwelling house where they lived, but gives her $1000 in money, which she is to take out of the estate of her deceased husband, which is to be paid to her or them, by preference.

The second section confers on the wife the usufruct of this sum during her widowhood, and then to pass to the children.

Here then are two objects, which the Act designs to accomplish, although neither is expressed in the title. The title of the Act is to secure a homestead, but the body of the Act gives money, creates a privilege and confers the usufruct on the wife during widowhood. Three objects are embraced in the Act, a gift, a lien, and a usufruct.

The Act violates Art. 119 of the same Constitution. It amends that part of the Civil Code, that establishes privileges, and creates a new privilege unknown to the Code, without noticing the part amended.

The preference is given over all creditors, except the vendor, and the person who has sold the property. The Code, Art. 3152, declares, that "Privileges can be claimed only for those debts to which it is expressly granted in this Code." This right is not conferred on the widow by the Code, but by the Act alone, and is therefore an amendment made by the Legislature to the Code, but no notice or reference is made to it in the Act.

*W. H. Hunt*, for opponent:

It is submitted, that the object of the Act of 1852, "to provide a homestead for the widows and children of deceased persons," is not expressed in its title, and that its real object is not to "provide a homestead for the widows and children of deceased persons." The meaning of the term homestead, is well defined, and cannot be mistaken. It is a term of general use and established signification. It is defined to mean the place of a mansion-house; the enclosure, or ground immediately connected with the mansion; native seat; original place of residence; the place of the house. [Webster's Dic., Walker's Dic.] Indeed, from the French text, it is apparent that the word is used in its true acceptation; the act is there styled "acte pour procurer une maison domiciliaire," &c.

Now, the obvious purpose of this statute is to "entitle the widow, or the legal representatives of the children, to demand and receive from the succession of their deceased father or husband, a sum which, added to the amount of property owned by them, or either of them, will make up the sum of one thousand dollars," &c.; and the second section allows the widow "the usufruct of the money so received," during her widowhood. In other words, the Act provides for a donation of a sum of money to, and does not provide a homestead for the widows and children of deceased persons.

Nor is there anything in the Act which requires that this sum of money should be invested in a homestead. Its investment is altogether arbitrary. It may be expended in the purchase of real or personal property of any nature,

or converted into stocks, or jewels, or pictures; or it may be kept in specie, until it belongs in full property to, and vests in the children, or other descendants of the deceased. If devoted to the purposes suggested, it cannot be seriously contended that the object expressed in the title to the Act would be fulfilled.

The provision of the Constitution of 1852, which the opponent invokes, was copied from the Article 118 of the Constitution of 1845, which had undergone repeated judicial interpretations. The former Supreme Court said that this Article, although declaratory and not prohibitory, was not the less of force on that account; that for the purpose of preventing future abuses in legislation, the Constitution had established its forms; and that their observance was imperative on every branch of the government, as much so as any other provisions of the Constitution. *State* v. *Hackett*, 5 Ann. 93. Accordingly in that case where an Act was passed, entitled "an Act to regulate and define the fees to be paid by owners of runaway slaves, for the taking up and confinement of the same," &c., and under its provisions, the custody and management of runaway slaves were changed, from the system previously prevailing, the court held that part of the Act making changes in these respects was in violation of the Art. 118 of the Constitution, and null and void. And in the case of the heirs of *Duvergé* v. *Salter*, the court went further in requiring a most rigid adherence to the Constitutional provision, and declared an Act entitled "an Act to give jurisdiction to the District Courts of New Orleans, over causes arising under the Act of 3d March, 1819, respecting landlords and tenants," to be unconstitutional, on the ground, that the object of that Act itself, which was to accord a summary mode of procedure in the cases arising under its provisions, was not included in the title. 5 Ann, 96. In the case of *Walker* v. *Caldwell*, the Chief Justice said, "the object and purpose of the Constitutional provision being evident and unquestionable, and its language free from ambiguity, the duty is imposed on the judiciary of giving it effect." 4 Ann. 298.

Surely, if the Constitution was violated in the cases referred to, it must be considered so in the important statute now before the court. For, what clue to the contents of this statute does the title afford? Who, in reading that title— "to provide a homestead," &c.—would expect to find the real object of the law to be to bestow a gratuity of a thousand dollars? When the act was called up by its title in the Legislature who could form any idea of its contents? These are significant questions which the court put in the cases already cited; and they are fair tests to be applied in determining the constitutionality of the statute of 1852.

But there is another respect in which the Act of 1852, violates this provision of the Constitution already cited. The first section provides, that the money allowed to the widow or children, "shall be paid in preference to all other debts, except those for the vendor's privilege, and expenses incurred in selling the property."

There is perhaps no portion of the admirable system of laws under which we live, and whose benefits we enjoy, which exhibits greater regard to the best interests of the citizen, which has been adopted after graver consideration, and which displays greater wisdom, than that part of our Code, which establishes and defines the privileges of creditors, and regulates the order in which they shall be paid.

The equitable principle of the civil law, that the property of the debtor, is the common pledge of all his creditors, forms part of the law of Louisiana; and our courts have uniformly held, that all laws according preferences to one class of creditors over another, are to be construed strictly, as being in derogation of the general principle of our jurisprudence. It is from this consideration, that the history of the legislation of our State discloses but few alterations in the judicious system of privileges, which the code originally enacted. That system has become generally known to, and is thoroughly understood by the people.

Now the clause of the Act just quoted, breaks up and entirely discards the familiar order of privileges previously existing, and substitutes an order altogether novel. It accords the highest rank, to the privilege of a vendor, and to the claims of auctioneers and others, who sell the succession property, and the next highest, to the widow or children of deceased persons. It postpones to these

privileges, those for funeral charges, law charges, expenses of the last illness, and the like, which the law, in a spirit of salutary wisdom, and enlarged humanity, has hitherto held most sacred. That chapter of the Code which treats of "the order in which privileged creditors are paid," becomes virtually abrogated:—and this important change in the system of our laws, is sought to be effected by an Act, the title of which discloses not the slightest clue to the object, and inevitable consequences of its provisions,—under an Act "to provide a homestead for the widow and children of deceased persons."

In the case before the Court, express provisions of law are directly overturned, and repeated decisions of the Supreme Court disregarded, by giving effect to this statute. The Code positively declares, that the privilege of a vendor, "yields to that of the owner of the house or farm for his rents," C. C. 3230. And in *Denistoun et al.* v. *Malard*, the court held that the landlord's lien is superior to that of the vendor. 2 Ann. 16. The judgment appealed from, adopting the order prescribed by the Act of 1852, directs that the opponent's claim for rent be paid after the claims of certain vendors. Thus, it will be seen, that the Article of the Code, and the decisions under it, are repealed by the Act of 1852. Who would judge so from its title?

Indeed, this statute abolishes and destroys that general principle of equity which has been spoken of; that "the property of the debtor is the common pledge of his creditors." C. C. 3150. Under its clauses, the property of the debtor ceases to be bound for his debts after his death. The principle of the civil law, *qui s'oblige, oblige le sien*, a principle which has been regarded as dictated by conscience,—*non scripta, sed nata lex*—is set at naught, and becomes utterly inoperative. The property of the debtor is donated to his relations, not bound to his creditors. The widow *Lanzetti* is to receive $1,000 in money from the succession of her husband *in honorem præteriti matrimonii;* and the common pledge of the actual creditors of the succession is irretrievably gone.

The record in this case shows that the sum sought to be allowed to the widow, is made up in part, of the proceeds of the sale of the unexpired term of the lease of the premises belonging to the opponent. Thus the effect of the Act of 1852, in the present instance, would be to transfer the opponent's property in the lease to the widow.

It is submitted that this is an Act of spoliation; that it is not a rightful exercise of Legislative power; and that the Legislature cannot violate thus, the right of personal property, and subvert natural right. It is against all reason and justice to intrust the Legislature with the power to take the property of A, and give it to B. This is the doctrine, and indeed the language in 3 Dallas, Rep. 388. *Calder et ux.* v. *Bull et ux.*

Chief Justice Marshall says: It may well be doubted whether the nature of society and government does not limit the legislative power, and whether the act of transferring the property of an individual without compensation to the public, (and *a fortiori* to a private person), be in the nature of legislative power. *Fletcher* v. *Peck*, 6 Cranch, 87.

So in *Taylor* v. *Porter*, the court deny the power of Government to take the property of one man and transfer it to another. If, under the power to legislate, the Legislature can take the property of A and give it to B, it is clothed with despotic power. 4 Hill's N. Y. Rep.. 146.

And again: In *Varrick* v. *Smith*, Chancellor Walworth argues that in a State governed by a written Constitution like that of New York, if the Legislature should so far forget its duty and the natural rights of an individual as to take his private property and transfer it to another, without compensation and without benefit to the public, he would not hesitate to declare it an infringement of the spirit of the Constitution, and not within the general powers of the Legislature. 5 Paige Rep. 159.

In *Wilkinson* v. *Leland*, 2 Peters 654, Judge Story, delivering the opinion of the court, said : "We know of no case in which a legislative act to transfer the property of A to B, without his consent, has ever been held a constitutional exercise of legislative power in any State in the Union. On the contrary, it has been constantly resisted as inconsistent with just principles."

So, in 1 Baldwin C. C. Rep. 223, it was held: that the Legislature had not the power to take the property of a man for private purposes without his consent. That if a law was clearly open to that objection, it would be a fatal one,

43

SUCCESSION OF    as it was opposed to every constitutional principle which protects the right of
LANZETTI.        property."

Article 105 of the Constitution provides that "vested rights shall not be divested unless for purposes of public utility, and for adequate compensation previously made." A right is said to be vested in a citizen when he has the power to do certain actions, or to possess certain things, according to the law of the land. 3 Dall. 394. When any one acquires private property, *bona fide*, he has a vested right in that property and in the enjoyment of all the fruits, revenues and profits issuing from it. To take away the right of the owner of a house, to receive the rents, is to divest him of a vested right.

It will thus be seen that the opponent relies not only on those general principles which limit legislative power in our country, but on the express restriction in the Constitution of our State.

A statute which thus disregards important and salutary forms prescribed by the Constitution, and overturns a judicious and long established system of laws; which, while it affects the specious pretence of affording a humane protection to poverty, in reality becomes the instrument of the grossest injustice and oppression; which sanctions spoliation and is subversive of natural right; which transcends the limits of delegated authority and conflicts with sacred constitutional restrictions;—such a statute, it is confidently believed, is not entitled to receive the favorable consideration of an enlightened judicial tribunal.

SLIDLL, C. J. There is a familiar maxim which tells us a man should be just before he is generous. In conformity with it, we find in all systems of jurisprudence donations by debtors at the expense of their creditors discountenanced, and our Code contains express provisions to that effect. What however, testators were formerly unable to do themselves, a recent statute does for them, and the case at bar illustrates its practical working; the widow of the deceased taking $1000 out of the estate and leaving its numerous creditors unpaid.

The entire funds of the estate amount to about $1800, and consist, with the exception of one or two small items, of the proceeds of sale of a small stock of dry-goods left at *Lanzetti's* decease, in a shop leased to him by Mrs. *Pontalba*. She claimed the landlord's privilege upon the price of these goods, but was defeated by the claims of the widow, and has appealed.

It is contended by the appellant that the Act of 17th March, 1852, upon which the allowance of $1000 to the widow was made, is unconstitutional. It is said to conflict with the Article 118 of the Constitution of 1845, which declares that "every law enacted by the Legislature shall embrace but one object, and that shall be expressed in the title." An article in the same words is found in our present Constitution. Art. 115.

The title of the Act of 1852, is "an Act *to provide a homestead* for the widow and children of deceased persons."

Its provisions are as follows:

Section 1. "That whenever the widow, or minor children of a deceased person, shall be left in necessitous circumstances, and not possess in their own right property to the amount of $1,000, the widow, or the legal representatives of the children, shall be entitled to demand and receive from the succession of their deceased father or husband, a sum which, added to the amount of property owned by them or either of them, in their own right, will make up the sum of one thousand dollars, and which said amount shall be paid in preference to all other debts, except those for the vendor's privilege and expenses incurred in selling the property."

Sec. 2. "That the surviving widow shall have, and enjoy the usufruct of the money so received, from her deceased husband's succession, during her

widowhood, afterwards to vest in and belong to the children or other descendants of said deceased."

The argument is, that the object of the Act is not expressed in the title; that the Act provides for a donation of a sum of money to, and does not provide a homestead for the widows and children of deceased persons. A homestead, it is said, means according to lexicographers and in common parlance, the place of a mansion house; the enclosure, or ground immediately connected with the mansion; native seat; original place of residence; the place of the house—and that from the French text, it is apparent the word was used in its true acceptation, the Act being thus styled "Acte pour procurer une maison domiciliare." It is also urged that there is nothing in the body of the Act which requires this sum of money should be invested in a homestead.

We think the argument invokes an interpretation of the constitutional clause too rigorous and technical. If in applying it, we should follow the rules of a nice and fastidious verbal criticism, we should often frustrate the action of the Legislature, without fulfilling the intention of the framers of the Constitution. That intention has been repeatedly the subject of judicial comment. It was mainly to prevent that loose legislation which disgraced our statute books. As was remarked by the court in *Walker* v. *Caldwell*, 4 Annual 298, "The title of an Act often afforded no clue to its contents. Important general provisions were found placed in Acts private or local in their operations; provisions concerning matters of practice or judicial proceedings were some times in the same statute with matters entirely foreign to them; the result of which was that on many important subjects the statute law had become almost unintelligible, as they whose duty it has been to examine, or act under it, can well testify. To prevent any further accumulation to this chaotic mass was the object of the constitutional provisions under consideration." In carrying out this intention, as we are bound to do, our enquiries should be, whether in the particular case there has been a substantial compliance by the Legislature with the command of the Constitution, according to its fair and reasonable intendment.

Thus construed, the Article has not, in our opinion, been violated in the present case. The title of the Act suggests as its object or subject-matter the provision of a homestead for the widow and minor children of deceased persons. The body of the Act provides for the pecuniary means by which a homestead or the comforts of a home may be acquired. The title of the Act does afford a reasonable clue to its contents, to wit: a provision for the domestic comfort of surviving widows and minor children.

This statute certainly affects the antecedent law on the subject of privileges contained in our Code. But it does so by creating an entirely new class of privileges for which the Code made no provision; and we do not think that under the constitutional clause above referred to, it was necessary that this legal consequence should be indicated in the title.

It is said the sum allowed to the widow is made up in part of the proceeds of the sale of the unexpired term of the lease of the premises belonging to Mrs. *Pontalba*, and that thus the effect of the Act of 1852, in the present instance, would be to transfer the opponent's property in the lease to the widow. We have not before us the particulars of this sale of the deceased's interest in the lease. We infer that the vendee bought what was inventoried, the interest of the deceased in the unexpired term, and in buying it, took it subject to the obligations of paying the monthly rent. This was substituting

one tenant for another. The value of the right of occupying the premises at the stipulated rent was something that belonged to the tenant, not to the landlord, and it was this right which we understand the purchaser as having bought and paid for. The price thus obtained was an asset of the succession.

Much was said at bar and very forcibly, of the injustice and the anomalous character of the statute of 1852. But such considerations cannot control the decision of this controversy. The statute violates no *vested* right of the appellant, for her lease was made after the passage of the statute, and she therefore made her contract subject to it and to the contingency of the landlord's privilege being frustrated by the happening of the event in the statute contemplated.

The same remarks apply to the claims of *Barnett.*

Judgment affirmed, one-half of the costs of appeal to be paid by each of the appellant's, Mrs. *Pontalba* and *M. Barnett, Jr.*