190 La. 7

**STATE ex rel. PORTERIE, Atty. Gen., v. HOUSING AUTHORITY OF NEW ORLEANS et al.**

No. 34935.

Supreme Court of Louisiana.

June 27, 1938.

Rehearing Denied July 8, 1938.

Gaston L. Porterie, Atty. Gen., and James O'Connor, 1st Asst. Atty. Gen., for appellant.

William J. Guste, of New Orleans, for appellees Housing Authority of New Orleans and Commissioners of Housing Authority of New Orleans.

Henry B. Curtis, Asst. City Atty., of New Orleans, for appellees City of New Orleans and Mayor and Commissioners of City of New Orleans.

ODOM, Justice.

The purpose of Act No. 275, page 697, of 1936, according to its title, is:

"To declare the necessity of creating public bodies corporate and politic to be known as housing authorities to engage in slum clearance and projects to provide dwelling accommodations for families of low income; to create such housing authorities in the cities having a population of more than 20,000; to define the powers and duties of housing authorities and to provide for the exercise of such powers, including acquiring property by purchase, gift or the exercise of the power of eminent domain, and including borrowing money, issuing bonds and other obligations, and giving security therefor; to confer remedies on obligees of housing authorities; to provide that housing authorities, their property and securities shall be tax exempt; to provide that the bonds of the authority shall be legal investments."

By section 4 of that act, the Legislature created in every city of the State having a population exceeding 20,000 inhabitants a public corporation or body politic to be known as "Housing Authority" of said city, to have boundaries coterminous with those of the city. It is provided, however, that such "Housing Authority" shall not transact any business or exercise such powers as are granted by the act until and unless the council of the city shall, by proper resolution, declare that there is need for such housing authority to function in said city.

This section of the act provides that, if a petition is filed, signed by twenty-five residents of the city, asserting that there is need for a housing authority and requesting that the council so declare, the council shall promptly determine whether there is need for such housing authority. It is further provided that the council shall adopt a resolution so declaring, if it shall find "(1) that unsanitary or unsafe inhabited dwelling accommodations exist in the city or (2) that there is a lack of safe or sanitary dwelling accommodations in the city available to families of low income at rentals they can afford".

It is further provided that in determining whether dwelling accommodations are unsafe or unsanitary "said council shall take into consideration the degree of overcrowding, the percentage of land covered, the light, air, space and access available to the inhabitants of such dwelling accommodations, the size and arrangement of the rooms, the sanitary facilities, and the extent to which conditions exist in such buildings which endanger life or property by fire or other cause. When the council adopts a resolution as aforesaid, it shall promptly notify the Mayor of such adoption".

The Council of the City of New Orleans adopted a resolution declaring that there was need in the City for a housing authority to function therein, and notified the Mayor. Section 5 of the act provides that, upon receiving notice of the adoption of such resolution by the Council, the Mayor shall appoint five persons to serve as commissioners of said housing authority and file with the city clerk a certificate of such appointment. The power and the duties of the housing authority are vested in the commission thereof.

Section 8 of the act provides that an authority (which means a housing authority) "shall constitute a public body corporate and politic", and shall have all the powers necessary or convenient to carry out and effectuate the purpose and provisions of the act, including the following among others:

"(b) Within its area of operation: to prepare, carry out and operate housing projects; to provide for the construction, reconstruction, improvement, alteration or repair of any housing project or any part thereof; to take over by purchase, lease or otherwise any housing project undertaken by the city or by any municipality or government; and to act as agent for the city or any municipality or government in connection with the acquisition, construction, operation or management of a housing project or any part thereof. * * *

"(d) To lease or rent any dwellings, houses, accommodations, lands, buildings, structures or facilities embraced in any housing project and to establish and revise the rents or charges therefor; to purchase, lease, obtain options upon, acquire by gift, grant, bequest, devise, or otherwise any real or personal property or any interest therein from the city or any person, firm, corporation, municipality, or government; to acquire by the exercise of the power of eminent domain any real property; * * * to procure insurance or guarantees from the Federal Government of the payment of any debts or parts thereof (whether or not incurred by said authority) secured by mortgages on any property included in any of its housing projects; to invest any funds held in reserve or sinking funds, or any funds not required for immediate disbursement in property or securities in which savings banks may legally invest funds subject to their control; and to purchase its bonds at a price not more than the principal amount thereof and accrued interest, all bonds so purchased to be cancelled.

"(e) Within its area of operation; to investigate into living, dwelling and housing conditions and into the means and methods of improving such conditions; to determine where unsafe, or unsanitary dwelling or housing conditions exist; and to study and make recommendations concerning the plan of the city or any municipality or government in relation to the problem of clearing, replanning and reconstructing of areas in which unsafe or unsanitary dwelling or housing conditions exist, and the problem of providing dwelling accommodations for families of low income, and to co-operate

with the city or any municipality or government in action taken in connection with these problems."

The Attorney General of the State, alleging that he was authorized under the terms and provisions of Section 56, Article 7, of the Constitution of Louisiana to institute and prosecute any or all suits or other proceedings as he may determine necessary for the assertion or the protection of the rights or interests of the State of Louisiana, brought the present suit, alleging that the Commissioners appointed by the Mayor of the City of New Orleans, pursuant to Act No. 275 of 1936, have organized themselves under the title of "Housing Authority of 'New Orleans", and, as such Housing Authority, have planned to, and are now planning to, construct within the City of New Orleans "a low-rent housing and slum clearance project" located within certain described boundaries within the City; that said Commissoners acting for the Housing Authority are threatening to acquire, both by purchase and by the exercise of the power of eminent domain, all the property within certain boundaries and "to demolish all structures thereon and to erect on said property certain structures for residential purpose which shall be leased at rentals sufficient merely to defray the maintenance and operating expenses and to discharge principal and interest on any obligations which may be incurred by said Housing Authority of New Orleans as a means of financing the acquisition of the necessary lands and the construction of dwelling units thereon."

It is further alleged that the estimated cost of said project is approximately $10,-000,000; that, as a means of financing said project, the defendants "have entered into a contract with the United States Housing Authority (hereinafter sometimes referred to as U.S.H.A.), dated March 18, 1938, whereby the said U.S.H.A. has agreed to purchase bonds of the said Housing Authority of New Orleans in the sum of $8,411,000 to bear interest at the rate of 3% per annum, and to be payable serially over a period of years beginning with 1954 and ending in 1998, all as more fully appears by referring to a copy of said Loan Contract hereto annexed, and identified as 'Exhibit A'".

It is further alleged that the defendants have entered into an agreement with the City of New Orleans, represented by its Mayor and Council, "whereby the Housing Authority of New Orleans agrees to pay annually unto the City of New Orleans the sum of $16,000 over a period of 60 years in consideration of certain services to be rendered by the City of New Orleans and the further consideration of the City of New Orleans agreeing to relieve the Housing Authority of New Orleans and the said project from all liability for any fees, charges, or other assessments made or levied by said City for a period of sixty years".

It is further alleged that the Housing Authority through its Commissioners has entered into an agreement with the City of New Orleans "whereby the City of New Orleans shall agree to purchase bonds of the Housing Authority of New Orleans in the principal sum of $1,050,000, maturity (maturing) serially over a period of approximately 15 years".

It is further alleged that the City of New Orleans has appropriated out of public funds of the City the sum of $25,000 to pay the expenses of the said Housing Authority of New Orleans, and that approximately $11,000 has actually been expended for such purposes and that further sums will be expended for such purposes unless the City of New Orleans is restrained from doing so.

Paragraph 12 of the petition reads as follows:

"That the development, operation and maintenance of a low-rent housing and slum clearance project as planned by said defendants and as defined in Act 275 of the Regular Legislative Session of Louisiana of 1936 is neither a public purpose, city purpose or public use for which the City of New Orleans is or may be authorized to expend public funds,. and, that, therefore, the Housing Authority of New Orleans should be restrained from further expenditure of any funds appropriated by the City of New Orleans for that purpose."

It is further alleged that Act No. 275 of 1936 does not authorize the City of New Orleans to make any appropriation for the benefit of the Housing Authority of New Orleans and that, "even if said appropriation is authorized by Act No. 275 of 1936, it is utterly invalid and void as a loan or grant of the funds of one political corporation of the State to a public corporation in violation of Article 4, Section 12 of the Constitution of the State of Louisiana".

The Attorney General alleges that Act No. 275 of 1936 is unconstitutional, utterly

void and of no effect, and sets out seventeen specific reasons why the act should be declared unconstitutional. ·These specific points made by the Attorney General will be discussed and disposed of later in this opinion.

The Housing Authority, through its Commissioners, and the City of New Orleans filed a joint answer in which it is admitted that the Housing Authority has been organized and that it has proceeded, and intends to proceed, with the housing project as alleged by the Attorney General. On behalf of the City it is admitted that an appropriation of $25,000 was made for the purpose of financing the Commission and that a portion thereof has already been spent and that the remainder will be spent if the City is not restrained. It is further admitted that the City has entered into a contract with the U.S.H.A. as alleged by the Attorney General.

It is especially denied, however, that the appropriation made and the contract entered into are illegal, and especially denied that Act No. 275 of 1936 is unconstitutional.

The Housing Authority and the City admit that the Authority is actively engaged in carrying out the plans for the construction of the low-rent housing and slum clearance project outlined in the petition of the Attorney General. The answer sets out that their acts are with full authority of law and in discharge of their duties, and that, "unless enjoined by this Court, they intend to continue their activities in the construction, maintenance and operation of such low-rent housing and slum-clearance projects in the City of New Orleans under the provisions of said Act No. 275 of 1936, and that they have secured an additional earmarking of Ten Million Dollars ($10,-000,000) fom the United States Housing Authority to finance the construction of such additional projects".

The answer specifically sets out that an investigation of conditions which exist in the City of New Orleans shows that in certain sections thereof many inhabitants on account of their low income

" * * * are crowded together and compelled to live in insanitary and unsafe dwelling accommodations or so-called slums. These slums are the breeding places of disease which takes its toll not only in the immediate neighborhood, but also among the inhabitants of the entire city and state. Juvenile delinquency and crime

and immorality are born there, find protection and flourish. Enormous economic losses result directly from the unnecessary expenditure of public funds to maintain health and hospital services for afflicted slum dwellers and to war against crime and immorality. The dwellings, themselves, are fire hazards, causing excessive expenditure of funds for fire-fighting and endanger the lives and property of the rest of the citizens of the city. These conditions have existed for some time. The enormous economic losses caused to the state and city by these areas and the responsibility of the state and city to bring about conditions in these areas whereby the moral and physical fibre of its manhood and womanhood may be strengthened is a matter of governmental concern. It is a public purpose for which the city's funds may be expended and a public use for which private property may be taken in expropriation proceedings."

From a judgment rejecting the Attorney·General's demands and dismissing his suit, he prosecutes this appeal.

The purpose of the Attorney General's suit is to have it declared that Act No. 275 of 1936, known as the "Slum Clearance" or "Housing Authority" Act, is unconstitutional, and to enjoin the City and the Housing Authority from proceeding further with the project contemplated.

Before discussing the many points raised by him, it is pertinent to say that Section 2 of the act sets out at length the .purpose of the law and the necessity for its enactment. It is declared that unsafe and unsanitary dwelling accommodations generally exist in the cities of the State having a population of more than 20,000, and that such unsafe and unsanitary conditions "arise from over crowding and concentration of population, the obsolete and poor condition of the buildings, improper planning, excessive land coverage, lack of proper light, air, space and access, unsanitary design and arrangement, lack of proper sanitary facilities, and the existence of conditions which endanger life or property by fire and other causes".

It is further declared in Section 2 of the act that in such cities many families of low income are forced to reside in unsanitary or unsafe dwelling accommodations; that in such cities there is lack of safe or sanitary dwelling accommodations "available at rents which families of low income can afford"; that for these reasons such families

are forced to occupy overcrowded and congested dwelling accommodations, and further declared that: "* * * the aforesaid conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the State and impair economic values; * * * that these conditions cannot be remedied by the ordinary operations of private enterprises;" that the clearance, replanning and reconstruction of such areas "* * * and the providing of safe and sanitary dwelling accommodations for families of low income are public uses and purposes for which public money may be spent and private property acquired; that it is in the public interest that work on such projects be instituted as soon as possible in order to relieve unemployment which now constitutes an emergency; and the necessity in the public interest for the provisions hereinafter enacted, is hereby declared as a matter of legislative determination."

At the trial the defendants offered in evidence several affidavits, one by Miss Wilmer Shields, Executive Secretary of the Council of Social Agencies of the City of New Orleans; another by Dr. James M. Batchelor, President of the Orleans Parish Board of Health; another by M. B. De-Pass, City Architect, and one by Alvin M. Fromherz, Consulting Engineer and Executive Secretary of the "Housing Authority of New Orleans".

The affidavit of Miss Shields shows that for ten years she has been connected with agencies having to do with social conditions in cities, and that she has been called upon to make an extensive study of social conditions in the City of New Orleans; that she has had occasion to study the conditions existing in the congested areas of the City, particularly in those areas commonly classified as slums; that those areas in the City of New Orleans included in one of the housing projects to be undertaken by the Housing Authority "represent two of the most congested sections in the City of New Orleans and two sections that call for immediate and prompt action in respect to any program of slum clearance and low-rent housing".

Her affidavit further sets out that it has been found from studies made by herself and those in similar fields "that there is a greater prevalence of juvenile delinquency, crime, disease and immorality existing in such congested or slum areas, than in any other sections of the city; that such juvenile crime, disease and immorality impose a disproportionate expense upon the community in the matter of rendering social service to the said communities as compared with other sections of the city; and that one of the effective means of improving conditions in such areas is through better housing".

Dr. J. M. Batchelor, President of the Orleans Parish Board of Health, stated in the affidavit made by him that he has had occasion to make a study of the health conditions existing in the various sections of the City of New Orleans, and that his study and investigations have disclosed to him "the greater prevalence of disease and insanitary conditions in the congested and slum areas than in other sections of the City; that this greater prevalence of disease and insanitary conditions has resulted in a greater expenditure of governmental funds for health work in connection with such areas than for other areas of the City". He stated further that it is his belief from his studies that such prevalence of disease and insanitary conditions would be removed by improving housing conditions in such areas.

Mr. DePass, City Architect of the City of New Orleans, stated in his affidavit that he has had occasion to examine and inspect the various buildings occupied as dwellings throughout the City, with the view of determining whether such structures were unsafe, unsanitary or constructed in violation of the various building codes of the City; that in connection with such examination and investigation he had learned "of the greater prevalence of unsafe, insanitary and improperly constructed dwellings existing in the congested and slum areas of the city as compared with other sections of the city, and that such unsafe, insanitary and poorly constructed buildings have represented constant danger to the general public as well as the occupants of such structures". He stated further that the areas of the City which the Housing Authority proposes to take over as projects "represent two of the most congested sections in the City of New Orleans and two sections that call for immediate and prompt action in respect to any program of slum clearance and low-rent housing".

Mr. Fromherz, Consulting Engineer and Executive Director of the Housing Authority of the City of New Orleans, stated in the affidavit made by him that the

areas of the City of New Orleans which the Housing Authority of the City proposes to take over for the establishment of one of its projects "represent two of the most congested sections in the City of New Orleans and two sections that call for immediate and prompt action in respect to any program of slum clearance and low-rent housing".

It is pertinent to state here that the act says in Section 8 that a "Housing Authority" shall *constitute a public body corporate and politic, exercising public powers*" and shall "have *perpetual succession*"; and to state also that, according to Section 6, "No commissioner or employee of an authority shall acquire any interest direct or indirect in any housing project or in any property included or planned to be included in any project". (Italics ours.)

(1) The first point raised by the Attorney General is that Section 23 of the act authorizes any city or municipality *and the State* to invest in bonds of a housing authority, and to expend public funds in furtherance of the aims and purposes of housing authorities. It is argued that this authorization violates Section 12, Article 4, of the Constitution, which provides that:

"The funds, credit, property or things of value of the State, or of any political corporation thereof, shall not be loaned, pledged or granted to or for any person or persons, association or corporation, public or private; nor shall the State, nor any political corporation, purchase or subscribe to the capital stock or stock of any corporation or association whatever, or for any private enterprise."

That portion of Section 23 of the act referred to provides that:

"All public officers, municipal corporations, political subdivisions, public bodies, insurance companies and associations, savings banks and institutions, savings and loan associations, executors, administrators, tutors, curators, trustees and other fiduciaries, in the State may legally invest funds within their control in bonds of an authority when they are secured by a pledge of the revenues of, or a first mortgage lien on, property", etc.

Clearly this provision of the act does not relate to "the funds, credit, property or things of value of the State". Included among those who may "legally invest funds within their control in bonds of an authority" when properly secured are "public officers". But the Legislature did not intend by that provision to authorize the public officers of the State who are by law intrusted with the custody of public funds to invest such funds in the bonds of the housing authorities created by the act, because such public funds as go into the custody of certain public officers of the State are not "within their control". They are "earmarked" for, and specifically dedicated to, certain purposes. The public funds of the State are derived from taxation in some form prescribed by legislative enactments, which enactments dedicate all taxes levied by the taxing statutes to some specific purpose. Certain public officers are designated custodians of such funds, but they must use them as directed; such funds are not "within their control".

But Section 23 of the Housing Act does specifically provide that "municipal corporations, political subdivisions, public bodies" may legally invest funds within their control in the bonds of an authority. It is argued that this violates that portion of Section 12, Article 4, of the Constitution, which says that the funds or credit of any political corporation of the State "shall not be loaned, pledged or granted to or for any * * * corporation, public or private; nor shall * * * any political corporation, purchase or subscribe for the capital stock or stock of any corporation".

The pleadings and the evidence show that the City of New Orleans, a political corporation created by the State, has already spent approximately $11,000 of the public funds of the city in furtherance of the slum clearance and housing project undertaken by the "Housing Authority" of the City and, if not restrained, will spend an additional sum up to $25,000 for the same purpose. And it is admitted that the City has agreed to, and will, purchase, if not restrained, bonds of the "Housing Corporation" in the principal sum of $1,050,000.

Now the question is whether the expenditures made and to be made and the proposal of the City to purchase these bonds are prohibited by the Constitution.

▪ We do not think they are. It is our opinion that Section 12, Article 4, of the Constitution does not prohibit municipal corporations from using public funds for the purposes here contemplated. The framers of the Constitution did not intend to debar municipal corporations from using public funds to protect the health, morals and safety of all their inhabitants, and, accord-

ing to what is clearly the primary purpose of Act No. 275 of 1936, that is precisely what a municipal corporation is doing when it uses public funds to assist in promoting these slum clearance and housing projects.

The fundamental purpose of all government, whether state or municipal, is to protect the morals and the health of the people and to provide for their safety. All governmental activities, complicated as they are, have that simple end in view.

The Legislature declared, and its declaration is supported by the testimony submitted by defendants, that so-called slum districts, where there is overcrowding, lack of light, ventilation and sanitary facilities, and therefore filth, constitute a menace not only to those who dwell therein, but to all other inhabitants of the city as well. The reason why such districts are menaces to all the inhabitants of the city is that they tend to breed disease, crime and immorality. The dangers arising from such conditions spread. They cannot be confined to the localities where they originate. They affect injuriously not only those who, on account of low incomes, must live in slum districts, but those who reside in the more favored districts as well. The most dangerous and menacing immoralities and debaucheries are practiced in the overcrowded and neglected areas of cities.

It is not denied—nor can it be—that it is the city's duty to all its inhabitants to eradicate these evils if possible and, to that end, make use of public funds.

The primary purpose of housing authorities is to eradicate the slum menace. In doing so, they lighten the burden of cities in discharging the municipal duty of protecting all citizens indiscriminately against disease, crime and immorality.

It is therefore perfectly clear that, when a city uses public funds for the establishment of a housing authority, whether the funds be used for organization expenses or in the purchase of a small percentage of the housing authority's bonds, the city is performing, indirectly through a public agency created by the State and sanctioned by its own governing authority, one of the primary functions of municipal government.

It is not suggested in this case that the amounts already used by the city and that to be used for these purposes are out of proportion to the benefits to be received. Nor is it suggested that these amounts are in excess of the amounts the City would have

to expend during the next few years to accomplish the same purposes.

The holding in the cases of Le Bourgeois v. City of New Orleans, 145 La. 274, 82 So. 268, and State ex rel. Henry Orr v. City of New Orleans, 50 La.Ann. 880, 24 So. 666, are in point and sustain our view in this case. See also Saucier v. City of New Orleans, 119 La. 179, 43 So. 999, and Benedict v. City of New Orleans, 115 La. 645, 39 So. 792.

The act does not violate that clause of Section 12, Article 4, of the Constitution, which prohibits political corporations from purchasing or subscribing "to the capital stock or stock of any corporation or association whatever". The act provides that municipal corporations "may legally invest funds within their control *in bonds of an authority* when they are secured by a pledge of the revenues of, or a first mortgage lien on, property" of housing authorities. Housing authorities created by the act are public corporations which have no capital stock.

(2) The second objection raised by the Attorney General does not involve the validity of Act No. 275 of 1936. It is alleged that the City of New Orleans is planning to close certain streets of the City within the area of the housing project and to sell the land comprised therein to the Housing Authority. The City admits this allegation but alleges in its answer that this will not be done "until after the Housing Authority of New Orleans shall have acquired title to the privately owned property within the respective areas. At such time the closing of said streets will be with the approval and consent of the then owner of the abutting property".

Section 8 of the Charter of New Orleans, Act No. 159 of 1912, as amended by Act No. 338 of 1936, authorizes the Commission Council "by a two-thirds vote to sell or change the destination of any street * * * which is no longer necessary for the public use to which it was originally destined". The right of the City Council of New Orleans to sell streets which are no longer necessary for the public use to which they were originally destined has been recognized by this court. See Schernbeck v. City of New Orleans, 154 La. 676, 98 So. 84; State ex rel. Ruddock Orleans Cypress Co. v. Knop, Civil Sheriff, 147 La. 1057, 86 So. 493. The closing or selling of such streets rests within the sound discretion of the Commission Council. We

cannot assume that the Commission Council will abuse its discretion.

(3) and (4) The validity of Act No. 275 of 1936 is further attacked on the ground that it was not "duly and properly passed, approved and promulgated" as required by the Constitution.

Under this heading the only point stressed by the Attorney General is that the act is a "local or special law" and that no notice of intention to apply for its passage was published as required by Section 6, Article 4 of the Constitution. If, as the Attorney General contends, the act is a local or special law, it is invalid, because the act itself does not recite that the requirement of the above cited article and section was complied with. See Federal Land Bank v. John D. Nix, Jr., Enterprises, 166 La. 566, 117 So. 720.

It is argued that the act is a local or special law because by its express terms its application is limited to cities of the State having a population of more than 20,000, there being only five such cities in the State.

If there were but one city in the State having a population exceeding 20,000, there might be merit in the argument. In the case of Federal Land Bank v. Nix, Enterprises, supra, it was said that Act No. 76 of 1910, authorizing municipalities of more than 100,000 population to adopt ordinances relating to the construction, equipment, repair and removal of buildings, was a local law, because the classification adopted was fictitious, there being at the time of the act's adoption only one city in the State having a population of over 100,000; so that the act was evidently intended to operate in only one locality, the City of New Orleans.

Act No. 275 of 1936 is different. It operates in all cities having a population exceeding 20,000, regardless of where they are located in the State. In view of the primary purpose of the act, which is slum clearance and the eradication of the evils engendered by slums, the classification is a reasonable one. The Legislature found—and it is common knowledge —that so-called slum districts are more prevalent in cities with a population exceeding 20,000 than in smaller ones. Therefore, there is more need for the operation of this law in the cities designated than in smaller ones and in towns. The law operates uniformly and equally upon all brought within the relations and cir- cumstances for which it provides. All persons residing in the territory designated by the act, wherever located, are similarly affected.

In the so-called "Blind Tiger Law", which was Act No. 8, Extra Session of 1915, it was made a misdemeanor for any person to operate a blind tiger in "any place in those subdivisions of the State where the sale of spirituous, malt or intoxicating liquors is prohibited". In the case of State v. Nejin, 140 La. 793, 74 So. 103, the defendant was prosecuted for conducting a blind tiger, and the validity of the act was assailed on the ground that it was a local or special law in that it operated and could have effect only in those parts of the State where the sale of spirituous or malt liquors was prohibited. It was held that the act was not a local or special law because (page 107):

"The statute applies in every organized community in the state where, in the exercise of the right of local option, the people have prohibited the sale of liquor, and is applicable to every other community, in the sense that, should any other choose to prohibit such sale, it will come immediately under its dominion. It is not therefore either a special or a local law within the meaning of either of the articles invoked."

The following cases are also directly in point: State v. Donato, 127 La. 393, 53 So. 662; City of Shreveport v. Nejin, 140 La. 785, 73 So. 996; State v. McCue, 141 La. 417, 75 So. 100; Clark v. City of Opelousas, 147 La. 1, 84 So. 433; State ex rel. Porterie v. Smith, 184 La. 263, 166 So. 72.

Our conclusion is, and we hold, that Act No. 275 of 1936 is not a local or special law.

(5) and (6) The fifth and sixth points raised by the Attorney General are (1) that the title to the act includes more than one object or subject, and (2) that the body of the act includes more than one object or subject.

Section 16, Article 3, of the Constitution provides that:

"Every law enacted by the Legislature shall embrace but one object, and shall have a title indicative of such object."

Clearly the act has but one object, and its title indicates that it is to set up machinery for the establishment and operation of public corporations to be known as "Housing Authorities". It is conceded

that its title is indicative of that object. But it is suggested that it "steps over the line" when it (a) confers remedies on obligees of housing authorities, (b) provides that housing authorities, their property and securities shall be tax exempt; and (c) provides that the bonds of the authority shall be legal investments.

Section 15 of the act confers upon each housing authority certain specific powers, included among which is the power to vest in the holders and owners of its bonds or other obligations the right, in event of default by said authority, to cure any such default by advancing any moneys necessary for such purpose, the moneys so advanced to be additional obligations of the authority; and further, in case of default, to vest in the holders or owners of such obligations the right to operate, to collect and receive rents, fees and revenues arising from the operation of the property and to dispose of the money so collected in accordance with agreement; to foreclose, through judicial proceedings, the mortgages granted by the authority to secure its bonds, and to foreclose such mortgages as to all or such part of the property covered by the mortgage as such obligee shall elect, and finally to provide the terms and conditions upon which an obligee may exercise such rights.

The housing authorities being corporations and bodies politic in law with full power to issue bonds and other obligations and to secure them by mortgage on their real property or by pledge of their revenue, it follows that they may confer upon their creditors reasonable remedies for enforcing such obligations. The remedies which the authorities are empowered to confer are not only reasonable, but are the same as individuals and corporations usually confer upon their creditors.

The purpose of declaring that the property and securities of the authorities should be exempt from taxes was to express the legislative intent that, in carrying out the objects for which they were to be organized, the housing authorities should be relieved of a burden which might hamper them in their operations; and the purpose of the provision that their bonds should be legal investments was to aid them in carrying out the one object for which they were created. We find no merit in this objection.

The further objection is made that the body of the act goes beyond its title, in that it undertakes to legislate on certain subjects which are not within the scope of the primary object of the act.

After enumerating in his brief several instances in which the body of the act goes beyond its title, counsel says that "practically all of its manifold provisions meet this test"—that is, are embraced within the title. "However", says counsel, "at least four of the eight matters mentioned above clearly fail to do so". And he especially mentions: (1) the authority given banks and trust companies to give security for the deposits of housing authorities; (2) the vesting of additional powers in municipalities conferred by Section 22; (3) the vesting in public officers, financial institutions, fiduciaries, etc., the legal right to invest funds within their control in the bonds of the authority, as conferred by Section 23; and (4) the vesting in the housing authorities the right to acquire, by purchase or its power of eminent domain, property for any housing project being constructed by a government, and to convey the same, with or without consideration, to such government for use in connection with such housing project, authorized by Section 11 of the act. We take it that the other points are abandoned.

If it be conceded that the authority conferred upon banks and trust companies to give security for deposits of housing authorities goes beyond the scope of the title, that does not in any sense affect the constitutionality of the act with respect to its main object and purpose as expressed in the title. This clause may be eliminated from the act without affecting its validity. The same may be said concerning the authority of financial institutions, such as banks and savings associations, to invest funds within their control in the bonds of housing authorities.

Concerning the objections listed under (2) and (4), these are embraced within the title. Section 22 of the act provides that the real property, bonds and notes of the housing authorities are exempt from taxes, and provides further that the city or municipality may fix a sum which shall be paid to it annually by a housing authority or agree upon a sum to be paid by the authority to the corporation in lieu of such taxes. This entire section relates to the exemption of the housing authorities from taxation, which exemption is especially provided for in the title.

The full meaning of Section 11 of the act, referred to under specification (4), is

not quite clear. However, it is clear that it refers to the acquisition of property by the housing authority, and that is germane to that portion of the title which provides that such authorities may acquire property by exercise of the power of eminent domain.

After a careful reading of the act, our conclusion is that, with the one slight and minor exception stated above, all the provisions in the body of the act are germane to the object expressed in the title.

In Southern Hide Co., Inc., v. Best et al., 176 La. 347, 145 So. 682, we said (page 683):

"It is not the purpose of this article to require that the title be an index to the contents of the act, or that every end and means convenient or necessary for the accomplishment of the general object of the act be set out at length in the title, but it is deemed sufficient, under the article, that the act contain but one object and that the object be fairly stated, although it be expressed in general terms, in the title of the act. All things proper or necessary to carry out the general object, so stated in the title, are deemed to be within the scope of the title. Thornhill v. Wear, 131 La. 479, 59 So. 909; State v. Hincy, 130 La. 620, 58 So. 411; Succession of Lanzetti, 9 La.Ann. 329."

This language has been repeated in at least three subsequent cases: Chauvin v. Louisiana Power & Light Co., 177 La. 193, 148 So. 23; Tichenor v. Tichenor, 184 La. 743, 167 So. 427; Peoples Homestead & Savings Ass'n v. Masling, 185 La. 800, 171 So. 36.

(7) Article 10, Section 1, of the Constitution declares that tax funds may be expended for public purposes only, and Section 5 of the same article declares that all taxes levied by the Legislature or by municipal governments must have purposes "strictly public in their nature".

Article 1, Section 2, of the Constitution authorizes the taking of land by expropriation proceedings only where the land is to be taken for "public purposes".

As we have stated in discussing the first objection raised by the Attorney General, the City of New Orleans has made available for the payment of the expenses in organizing the "Housing Authority of New Orleans" the sum of $25,000 and has actually expended approximately $11,000 and will, if not restrained, spend the balance for the same purpose.

The Attorney General argues that such use of the public funds of the City of New Orleans violates Sections 1 and 5 of Article 10, because it is argued that the expenditure of this money is not for a public purpose. The act provides that the Housing Authority may acquire property by expropriation under its power of eminent domain, and it is argued that the statute which grants this power violates Article 1, Section 2, of the Constitution because the taking of such property is not for "public purposes".

We have already shown (see discussion under heading #1) that the Housing Authority authorized by the act subserves a public purpose in the truest sense. At Page 25 of the Attorney General's brief he says that:

"* * * the State of Louisiana, through one of its subdivisions, is going into the real estate rental business to provide homes for certain types of families described as 'low-income families'."

There is no merit in the argument that either the Housing Authority or the City of New Orleans is going into the real estate business. It is true that the Housing Authority is authorized to erect and lease houses to persons of low income. But that is a mere incident to the main purpose of the act, which, as we have already said, is to clear the slums and thereby to protect the lives, the health and the morals, not merely of those who presently live in the slum sections and who will ultimately occupy the buildings to be erected, but of the entire population of the City. That the City may expend its public funds for such purposes we think cannot be questioned.

It being true that these housing authorities subserve a public purpose, it follows necessarily that the acquisition by them of private property for their uses is for public use. In view of many of our own decisions, as well as decisions of the courts of other states and numerous cases decided by the Supreme Court of the United States, it is hardly necessary to indulge in further discussion of this point, except to cite the cases.

In New Orleans Land Co. v. Board of Levee Commissioners, 171 La. 718, 132 So. 121, this court held that the improving of the lake front and providing for the safety, health and welfare of the inhabitants of the City of New Orleans were a public benefit justifying the levee board in ap-

propriating lake bottom and adjacent swamp lands.

With reference to the lands sought to be appropriated, we said (page 123):

"Their improvement for the avowed purpose of providing for the safety, health, and welfare of the inhabitants of the city of New Orleans is distinctly such a public benefit as justifies the appropriation of the lands for such purpose by the defendant levee board under its constitutional authority."

In City of New Orleans v. New Orleans Land Co., 173 La. 71, 136 So. 91, it was held that the "taking of land for enlargement of public park is for 'public use' ".

See also Dalche v. Board of Commissioners of Orleans Levee Board, D.C., 49 F.2d 374.

Other cases of similar import decided by this court might be cited.

In the case of New York City Housing Authority v. Muller, 270 N.Y. 333, 1 N.E. 2d 153, 105 A.L.R. 905, the only question involved was whether the expropriation of private property for use of the New York Housing Authority (similar to, and organized for the same purpose as, the New Orleans Housing Authority) was a taking of property for public use. In that case the court stated that the purpose of the expropriation was "the clearance, replanning and reconstruction of part of an area of the City of New York, State of New York wherein there exist, and the petitioner has found to exist, unsanitary and substandard housing conditions".

It was found that the Housing Authority had purchased property contiguous on both sides to the premises sought to be condemned. The owner of the property resisted the condemnation proceedings on the ground "that the Municipal Housing Authorities Law violates article 1, section 6, of the State Constitution and the Fourteenth Amendment of the Federal Constitution [U.S.C.A.Const. amend. 14], because it grants to petitioner the power of eminent domain for a use which is not a public use".

The court said that the objection disregarded the primary purpose of the legislation, and held that the taking of the property was for a public use.

In support of its holding the New York court cited the following decisions of the Supreme Court of the United States: Mt.

Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co., 240 U.S. 30, 36 S.Ct. 234, 60 L.Ed. 507; Strickley v. Highland Boy Gold Mining Company, 200 U.S. 527, 26 S.Ct. 301, 50 L.Ed. 581, 4 Ann. Cas. 1174; Rindge Co. v. Los Angeles County, 262 U.S. 700, 43 S.Ct. 689, 67 L.Ed. 1186; Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369.

We shall not review the cited decisions of the Supreme Court of the United States. It suffices to say that they support the ruling made in the Muller Case, supra.

The benefits derived from the establishment of the housing projects, authorized by Act No. 275 of 1936, do not inure solely to the benefit of the persons who may ultimately occupy the houses to be built. The primary purpose of the legislation is not to benefit that class alone or any particular class; it is to protect and safeguard the entire public from the menace of the slums, and for that reason the acquisition of the property is for a public use.

See Willmon v. Powell, 91 Cal.App. 1, 266 P. 1029.

(8) In Section 22, Act No. 275 of 1936, it is declared that the notes, debentures, bonds and other evidences of indebtedness of a housing authority are "issued for a public purpose and to be public instrumentalities and, together with interest and income thereon, shall be exempt from taxes". The same section further provides that housing authorities shall be exempt from the payment of taxes to the State or any subdivision thereof, including municipalities.

The Attorney General raises the point that this provision of the act violates Section 4, Article 10, of the Constitution, which says that:

"The following property, and no other, shall be exempt from taxation: All public property."

Then follows a long list of the special kinds of property which are exempt.

The property of housing authorities does not fall within any of the classes specially exempted; so that, unless this kind of property is included within the general term "Public Property", it is not exempt.

Section 22 of the act amounts to nothing more than a mere declaration by the Legislature that the property of housing authorities is, and should be classed and regarded as, public property. Property

which is constitutionally subject to taxation cannot be exempted by legislative fiat. The members of the Legislature are presumed to have known this. But it is declared in Section 22 that the notes, bonds and other obligations of these specially created public corporations are "issued for a public purpose and to be public instrumentalities". Section 2 of the act sets out the Legislature's "Finding and Declaration of Necessity" for the establishment of housing authorities for the protection of the general public from the menace of slums, and it is declared:

"* * * that these conditions cannot be remedied by the ordinary operations of private enterprises."

The affairs of the housing authorities are administered by Commissioners appointed by the Mayor of the City. No member of the City Council can be a commissioner, and "A commissioner shall receive no compensation for his services". Section 6 of the act provides that "No commissioner or employee of an authority shall acquire any interest direct or indirect in any housing project or in any property included or planned to be included in any project, nor shall he have any interest direct or indirect in any contract or proposed contract for materials or services to be furnished or used in connection with any housing project". And Section 7 provides that any commissioner found guilty of such misconduct may be removed by the Mayor.

The housing authorities are public bodies corporate and politic and are given perpetual succession. Their purpose is clearly defined and limited to one: The clearance of slums and the eradication of slum evils. They cannot, under the act, subserve a private interest of any nature or character. But they do in fact subserve a public interest. Hence the declaration in Section 22 relative to taxation.

█ It is suggested, and we think must be conceded, that a mere declaration by the Legislature that certain property is for a public use or for a public purpose is not conclusive. The determination of such question is a judicial and not a legislative function. But courts should, and do, have great respect for legislative declarations concerning the public policy of the State.

The specific declarations and provisions of this act leave us in no doubt as to the legislative intent concerning the character of the property of these housing corporations. These declarations, as we have said, are not conclusive or binding upon the courts. But, to say the least, they are persuasive.

█ Independently, however, of the legislative intent, our opinion is that such property is for public use and is "public property", within the meaning of that term as used in the Constitution.

In discussing this point, the Attorney General says at Page 32 of his brief:

"If its purposes are not public purposes, but, on the contrary, are private purposes, then the essential nature of the corporation and its property become private and not public."

And on Page 33 he says:

"Therefore, it would only be reasonable to hold that property devoted to a private use is not 'public property' within the tax exemption provisions of the Constitution."

Such property is not devoted to private use. In Green v. Frazier, 44 N.D. 395, 176 N.W. 11, the Supreme Court of North Dakota, in discussing the difference between private property and property dedicated to public use, said:

"A private business or enterprise is one in which an individual or individuals, an association, copartnership, or private corporation have invested capital, time, attention, labor, and intelligence for the purpose of creating and conducting such business, for the sole purpose that those who make such contributions may, from the conducting and operating of it, make, gain, and acquire a financial profit for their exclusive benefit, improvement, and enjoyment, and exclusively for their own private purposes and use.

"A public purpose or public business has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political division, as, for example, a state, the sovereign powers of which are exercised to promote such public purpose or public business."

No person or corporation can make, gain or acquire any financial profit for his or its exclusive benefit through the establishment and operation of a housing authority, and it follows that property acquired by such authorities is not private property. Private property is that which one owns, something that belongs absolutely and exclusively to an individual. "Pri-

vate estates and fortunes are things which belong to individuals." Revised Civil Code, Article 459. The property of housing authorities is in no sense private property. But in a real sense it is public property because it is employed for the sole benefit and advantage of all members of society.

It is true that such property will not and cannot be used personally by all the inhabitants of the City any more than could all of them use the John Dibert Tuberculosis Hospital of New Orleans. But that hospital is a public institution. Le Bourgeois v. City of New Orleans, 145 La. 274, 82 So. 268.

To say that, because the property of these housing authorities is to be leased to a class designated as persons of low income, the use of it is private and not public, is to disregard entirely the primary purpose of the legislation—the purpose for which housing authorities are organized, which we have already explained in detail and at length under headings (1) and (7).

Our conclusion is, and we hold, that the property of these housing corporations is public property and therefore exempt from taxation.

(9) The Attorney General propounds the question whether the contract between the City of New Orleans and the Housing Authority surrenders, suspends or contracts away the power of taxation, in violation of Article 10, Section 1, of the Constitution, which provides that the power of taxation "shall never be surrendered, suspended or contracted away".

For the reasons already stated, our answer is "No".

(10) The Attorney General raises the objection that Act No. 275 of 1936 unconstitutionally delegates legislative powers to the councils of cities to determine when and if a housing authority shall transact business or exercise its powers, and to housing authorities to determine the amount of income which shall bring families within the definition of "families of low income".

In State v. Guidry, 142 La. 422, 76 So. 843, the same objection was levelled at Act No. 54 of 1914, in that it delegated to the Conservation Commission the right to ascertain and determine as a matter of fact whether any particular area does or does not contain a natural oyster reef as defined in the statute. Answering that objection, we said (page 846):

"To ascertain and determine such facts is not a legislative function. The authority of the Legislature to delegate to the administrative boards and agencies of the state the power and authority of ascertaining and determining the facts upon which the laws are to be applied and enforced cannot be seriously disputed."

To the same effect are the cases of State v. Harper, 42 La.Ann. 312, 7 So. 446, and State v. Westmoreland, 133 La. 1015, 63 So. 502.

The right of a city to investigate and determine whether such conditions exist as warrant the organization of a housing authority and the right of the housing authority to determine the question as to what persons are to be considered those of low income as prescribed in the act, are not legislative functions.

(11) A further objection to the act is that it attempts to amend statutes relating to certain subjects without reenacting and publishing such laws at length, in violation of Section 17, Article 3, of the Constitution.

The answer to this objection is that Act No. 275 does not pretend to amend any statutes. See discussion under headings (5) and (6).

(12) and (13) Section 10 of the act provides that:

"When an authority by resolution has found and determined that certain real property described therein is necessary for a housing project, such resolution shall be conclusive evidence that such property is necessary therefor and that said housing project is planned or located in the manner which will be most compatible with the greatest public good and the least private injury."

The Attorney General interprets this provision to mean that the right of the courts to determine the question as to whether the taking of the private property of individuals is in fact for a public use, is taken away and vested in the Housing Authority. If his interpretation is correct, this provision is unconstitutional because the determination of such a question is a judicial function which the Legislature could not delegate to the Housing Authority. Courts are always open to private citizens to have such questions determined.

■ But we do not agree with the Attorney General in his interpretation of the meaning of this provision. What this provision means is that a housing authority, and not the administrative or executive department of a city, is to determine the propriety of locating a project in any particular part of the city, and that, as to that, the decision of the housing authority is conclusive.

The act says that, when an authority by resolution has found and determined that certain real property described therein "is necessary for a housing project" and that said housing project is "planned or located in the manner which will be most compatible with the greatest public good and the least private injury", such resolution is conclusive as to those matters. This provision does not relate to the taking of private property which may happen to be included within the area designated for· the establishment of a "project".

Under our interpretation of this provision, it not objectionable and does not deprive the individual property owners of due process of law relating to expropriation proceedings.

■ (14) and (16) The Attorney General propounds the question whether a housing authority is such an agency of the State or the City as to make the State or the City liable for its debts and whether the constitutional limitations as to· the amount of indebtedness which may be contracted by any political corporations are violated by the act.

The answer to these questions is found in the last clause of Section 13 of the act, which reads as follows:

"Neither the commissioners of an authority nor any person executing the bonds shall be liable personally on the bonds by reason of the issuance thereof. The bonds and other obligations of an authority (and such bonds and obligations shall so state on their face), shall not be a debt of the city, any municipality or the State and neither the city, any municipality nor the State shall be liable thereon, nor in any event shall they be payable out of any funds or properties other than those of said authority. The bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction. Bonds may be issued under this Act notwithstanding any debt or other limitation prescribed by any statute."

■ (15) The last contention made by the Attorney General is that in effect the Housing Authority is a municipal corporation within the meaning of Article 14, Section 14, of the Constitution of Louisiana, and that therefore it may issue bonds only in the manner set forth in subdivisions (a) and (m) of the said Article 14, Section 14, and that neither is being complied with.

A housing authority is not a municipal corporation.

"A municipal corporation is a body corporate and politic, established by law to share in the civil government of the country, but chiefly to regulate and administer the local or internal affairs of the city, town or district incorporated."

"A municipal corporation is defined by Bouvier to be a public corporation created by government for political purposes, and having subordinate and local powers of legislation."

See Words and Phrases, First, Second, Third and Fourth Series, under the general heading Municipal Corporation.

For the reasons assigned, the judgment in favor of the defendant Housing Authority of New Orleans et al. and against Relator Gaston L. Porterie, Attorney General, rejecting relator's demands and dismissing his suit, is affirmed.